```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
                      WESTERN DIVISION
```
_____

UNITED STATES OF AMERICA,

       Plaintiff,

  vs.

                                                                         No.18-20056-JTF-dkv

JONATHAN SHELTON,

       Defendant.
_____

  REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS
_____

On February 22, 2018, the grand jury returned an indictment against the defendant, Jonathan Shelton (Shelton"), charging him with one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 1.) Now before the court is Shelton's February 8, 2019 motion to suppress evidence obtained by Memphis Police Department ("MPD") officers following a traffic stop of Shelton on April 23, 2017. (Def.'s Mot. to Suppress, ECF No. 98.) The government filed a response on February 22, 2019. (Gov't's Resp., ECF No. 102.) The motion was referred to the United States Magistrate Judge for an evidentiary hearing and report and recommendation. (ECF No. 101.)

Pursuant to the reference, the court held an evidentiary hearing on March 28, 2019. At the hearing, the government called two witnesses: (1) Shelby County Sheriff's Office ("SCSO")

Detective Jarrett Parks ("Detective Parks"), and (2), Memphis Police Department ("MPD") Detective Mario Tate ("Detective Tate"). The government introduced one exhibit into evidence: a photograph of the backseat of the car in which Shelton was riding. Shelton did not call any witnesses, nor did he introduce any exhibits into evidence.

After careful consideration of the statements of counsel, the testimony of the witnesses, the exhibit introduced at the hearing, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied.

I. PROPOSED FINDINGS OF FACT

The government's first witness, Detective Parks, has been an officer of SCSO for fourteen years and is currently assigned to the Multi-Agency Gang Unit ("MGU"), a unit of state and federal officers with a mission to conduct investigations on criminal gangs and to disrupt the illegal activities of gang members and gangs on an organizational level.  On April 23, 2017, members of the MGU were assigned to work the Agricenter International ("Agricenter") – located at 7777 Walnut Grove Road, Memphis, TN 38120 – due to a high number of thefts in the parking lot and inside the Expo Center and where a gun show was being held. While there, a security officer informed members of the MGU that one individual, later identified as Shelton, was being escorted out of the gun show by security due to a smell of marijuana. Detective Parks testified that officers observed Shelton, who was standing outside the entrance to the gun show, hand a large amount of cash to a woman, later identified as his mother and co-defendant, Tammy Fox ("Fox").  Fox then re-entered the gun show. A short while later, MGU officers observed Fox exit the gun show carrying a gun.  Fox and Shelton then entered the rear seat of a 2006 Mitsubishi Endeavor, Tennessee tag number SN2430.  A total of four persons were in the vehicle.  Detective Parks testified that he noticed that the window tint on the vehicle looked dark and relayed that information to other officers on the MGU working

3

at the Agricenter that day.

The government's second witness, Detective Tate, has been a MPD officer for ten years. Although now stationed in a general investigatory unit, on April 23, 2017, Detective Tate was assigned to the MGU. Detective Tate corroborated Detective Parks's testimony, stating that the MGU was assigned to work the Agricenter during the gun show due to a heightened occurrence of thefts both inside and outside the gun show. Detective Tate testified that Detective Parks informed him that Mr. Shelton caused a disturbance at the gun show, was escorted out due to a smell of marijuana, and that there were weapons in the vehicle. Detective Tate found the vehicle traveling northbound on Germantown Parkway near Trinity Road and initiated a traffic stop because the windows appeared to be below the legal limit of 35% light transmittance. Detective Tate testified that he is experienced in both using the tint meter and in estimating whether a window's tint level is below the 35% threshold as required by Tennessee law. Detective Tate testified that he was trained to use a tint meter by his field training officer, has completed over one hundred (100) stops for window tints, and has used a tint meter over one hundred (100) times.

When detective Tate approached the vehicle, the driver of the vehicle rolled both the front and back driver-side windows down. Detective Tate testified that, at that time, he smelled

4

marijuana and observed a weapon in the floorboard of the passenger side backseat. Detective Tate requested that the driver partially roll the front driver's side window back up, so that he could conduct a tint comparison test. Detective Tate conducted a tint comparison test on the driver's side front window with a tint meter, which measures the percentage of light transmittance through a window. The tint meter indicated that the light transmittance of the vehicle was 21%, below the legal limit in Tennessee. Thereafter, Detective Tate conducted a search of the vehicle.

Detective Tate also testified that he took a photograph of the interior, back seat of the vehicle, a photo which was authenticated and then proffered as evidence by the government. (Exh. 1.) The front, passenger-side window is partially visible in the photograph. (*Id.*) Detective Tate testified that window tinting is designed so that when looking from the inside out the window tint does not look as dark as it looks when viewing from the outside in. Finally, Detective Tate also testified that the policy of the MGU does not dictate that officers must wear dashboard cameras or body cameras.

5

II. PROPOSED CONCLUSIONS OF LAW

In the instant motion to suppress, Shelton challenges the validity of his traffic stop. (Def.'s Mot. to Suppress 3-5, ECF No. 98.) Specifically, Shelton argues that the officers "lacked specific and articulable facts upon which to base reasonable belief that the vehicle in question had window tint . . . below the legal limit for light transmission." (*Id.* at 4.) In response, the government submits that, given the officers' familiarity with window tinting, they had a reasonable suspicion that the vehicle's windows were unlawfully tinted. (Gov't's Resp. 4, ECF No. 102.)

A.   <u>The Credibility of the Witnesses</u>

The court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002)(citing *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015). The court finds the witnesses in this case credible. Specifically, Detective Parks and Detective Tate testified consistently with one another. They provided virtually identical accounts of the events surrounding the traffic stop on April 23, 2017. Further, Shelton did not call any witnesses and, therefore, Detective Parks's and Detective Tate's testimonies are not contradicted.

B.   Validity of the Traffic Stop of the Vehicle

A traffic stop is a "seizure" subject to the reasonable requirement of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010)("The Fourth Amendment's prohibition against unreasonable searches and seizures by the government 'extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002))). The Sixth Circuit held in *Simpson* that based on its prior decision in *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), officers must have probable cause to initiate a traffic stop for a completed misdemeanor, such as veering into an emergency lane, but only reasonable suspicion for a traffic stop for an ongoing misdemeanor, such as driving on a suspended license. *Simpson*, 520 F.3d at 541; *see also United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007)(finding that the misdemeanor traffic offense of following another vehicle should be evaluated under reasonable suspicion). Because the alleged violation in the present case was "ongoing," i.e., the officers believed the vehicle had window tint darker than the legal range, the court applies the reasonable suspicion standard.

Moreover, the permissibility of a traffic stop does not depend on the actual motivations of the individual officers

8

involved.  *Whren*, 517 U.S. at 813; *United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2010); *United States v. Burton*, 682 F.3d 514, 516 (6th Cir. 2012).  Thus, if at the time of the stop the officer had a reasonable suspicion that the target was violating a traffic law or ordinance, "then it simply does not matter whether [the officer] intended to stop [the defendant] on the basis of that traffic violation" or instead intended to stop the defendant because he suspected criminal activity was afoot. *Hughes*, 606 F.3d at 316.  The Sixth Circuit explains:

> [I]n order for traffic stop to be permissible under the Fourth Amendment, a police officer must know or reasonably believe that the driver of the car is doing something that represents a violation of law.  This is not to say that officers must be able to, at the time of the stop, cite chapter and verse – or title and section – of a particular statute or municipal code in order to render the stop permissible.

*Id.*

Here, having found the officers' testimonies reliable, the court finds that there was reasonable suspicion for initiating the traffic stop.  At the suppression hearing, both officers testified, based on their experience, that they observed the darkened windows and believed the vehicle's window tint resulted in visible light transmittance of less than 35%, which constitutes a violation of state law.  *See* Tenn. Code Ann. § 55-9-107(a)(1)(A)(making it illegal for anyone to operate a motor vehicle with window tint that results in visible light

transmittance of less than 35%). Detective Tate testified that he had substantial prior experience enforcing this Tennessee traffic regulation, estimating that he had conducted over one hundred (100) tint comparison tests in his tenure as a police officer, both under the supervision of a field training officer and on his own accord. The Sixth Circuit has held that this is enough to establish a reasonable suspicion sufficient to support a traffic stop. *See, Shank*, 543 F.3d at 313 (holding that the officers had a proper basis to initiate a traffic stop "[d]ue to the officers' familiarity with window tinting" and their estimate that the windows were tinted darker than permitted by law); *U.S. v. Moreno*, 43 F. App'x 760, 765 (6th Cir. 2002)(holding that the officer had at least a reasonable suspicion sufficient to justify a traffic stop where the undisputed proof showed that the vehicle's windows "were tinted to *some* optically discernable degree" which the officer adjudged to appear violative of the controlling legal standard). Moreover, upon conducting a tint comparison, the tint meter indicated that the light transmittance of the vehicle was 21%, which was in fact below the legal limit in Tennessee. Therefore, the court finds that there was reason to believe that the vehicle in which Shelton was riding was being operated in violation of state law. Accordingly, the traffic stop was not improper.

For the foregoing reasons, the officers had developed a

reasonable articulable suspicion to stop the vehicle in which Shelton was riding for violating Tenn. Code Ann § 55-9-107(a)(1)(A).

## I. CONCLUSION

For the reasons expressed above, it is recommended that Shelton's motion to suppress be denied.

Respectfully submitted this 1st day of April, 2019.

s/Diane K. Vescovo
DIANE K. VESCOVO
CHIEF UNITED STATES MAGISTRATE JUDGE

## NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.